UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELIZABETH DIANE HOPE,

    Plaintiff,

v.                                    Case No. 8:20-cv-196-VMC-AAS

AUSTIN TAYLOR,
and CHARLES RICHARD WELLS,

    Defendants.

_____/

**ORDER**

This matter comes before the Court pursuant to Defendant Austin Taylor's Motion for Summary Judgment (Doc. # 46), filed on December 17, 2020, Defendant Charles Richard Wells's Motion for Partial Summary Judgment (Doc. # 44), filed on December 17, 2020, and Plaintiff Elizabeth Diane Hope's Motion for Summary Judgment (Doc. # 43), filed on December 16, 2020. For the reasons discussed below, Deputy Taylor's Motion is granted in part and denied in part, Sheriff Wells's Motion is granted, and Ms. Hope's Motion is denied.

I.  **Background**

The following facts are undisputed. On the evening of June 3, 2019, Ms. Hope was sitting at a table outside her friend's home playing dominoes. (Doc. # 43-1 at 36:1-21). The

home was situated in a residential area, across the street from a small field. (Id. at 34:1-35:2).

That same night, around 6:00 PM, Deputy Taylor began his shift. (Doc. # 43-2 at 12:13-18). Deputy Taylor is an officer who works with the K-9 unit of the Manatee County Sheriff's Office. (Id. at 5:2-12). As Deputy Taylor was driving his patrol vehicle, he noticed a black Ford with tags matching a vehicle listed as stolen. (Id. at 12:15-13:9, 14:11-13).

Circling around, Deputy Taylor pulled in behind the suspected stolen vehicle. (Id. at 14:14-15:13). As he was reporting this over his radio, the vehicle quickly pulled out of the parking lot and drove away. (Id.). Deputy Taylor followed the vehicle at high speeds until it stopped in front of a residence. At this point, Deputy Taylor witnessed three young males, around fifteen to eighteen years old, flee the vehicle. (Id. at 16:4-17:17).

Deputy Taylor stopped his vehicle and released his K-9 partner Niko. (Id. at 16:22-17:12). Niko is trained to bite and hold suspects, securing the individual until his officer gives either the "release" command or physically removes him. (Id. at 26:22-37:14; Doc. # 44-3 at ¶ 7).

Upon exiting the vehicle, Deputy Taylor gave Niko the "engage" command, which is a command "to apprehend . . . the

people that were running." (Doc. # 43-2 at 17:11-15). An "apprehension" command and "bite" command are "loosely" the same thing, as the dogs are trained to apprehend individuals by "grab[bing] ahold and just kind of hold[ing] the suspect." (Doc. # 43-5 at 32:22-33:10). Once told to engage, Niko began running, off-lead, towards the suspects. (Doc. # 43-2 at 17:11-12, 19:11-16, 26:13-17).

As Deputy Taylor was releasing Niko, the suspects were crossing a guardrail next to a set of train tracks. (Id. at 20: 7-16). Niko failed to jump over the guardrail after the suspects until prompted by Deputy Taylor. (Id. at 13-16). After Deputy Taylor gave the "up" command, Niko cleared the guardrail and ran in the direction of the suspects. (Id.). Deputy Taylor followed, running to keep up. (Id. at 34:1-7).

At this point, the suspects were crossing an open field. (Id. at 22:20-21). One suspect jumped on the roof of a nearby van, while another ran to the right towards the residential area where Ms. Hope was playing dominoes. (Id. at 24:19-25:11, 25:16-19). Niko continued to run in the direction of the suspect who went right, towards the residences. (Id. at 25:16-19). The suspect ran between an alleyway behind the houses. (Id. at 28:9-15).

3

At this point, Niko encountered Ms. Hope and the parties' stories diverge. In his deposition, Deputy Taylor testified that Niko was walking past Ms. Hope, uninterested, until Ms. Hope screamed, flipped a table, and started swinging her arms. (Id. at 31:7-10). Deputy Taylor stated that the commotion attracted Niko's attention, causing the dog to turn and face Ms. Hope. (Id. at 32:18-21).

Upon watching Niko lose sight of his target, Deputy Taylor testified that he began administering the recall command "here" and the "fuey" command, or "bad command," to tell Niko "[he] didn't want [Niko] to go for those people." (Id. at 34:1-14).

According to Deputy Taylor, Niko responded to these commands and started coming back towards him, but Ms. Hope grabbed a chair and began using it as a shield between herself and Niko. (Id. at 33:21-23). Ms. Hope "took the chair and was, essentially, trying to push [Niko] away with the chair." (Id. 34:19-25). Deputy Taylor testified that this whole time, he was running "straight towards" Niko through the open field and giving him the recall and fuey command. (Id. at 34:1-11, 35:22-24). Despite these commands, Niko interpreted Ms. Hope's actions as aggression and responded by biting Ms. Hope's arm. (Id. at 35:1-3).

4

"[A]s soon as [Niko] bit Ms. Hope," Deputy Taylor testified that he "took off running after him just to go get ahold of him." (Id. at 35:22-24). When asked whether he was "still giving commands" while Niko "[was] on [Ms. Hope's] arm," Deputy Taylor admitted that "no commands were given," "not after [Niko] got on her." (Id. at 35:21-26:3). But as soon as Deputy Taylor reached the dog, physically grabbed its collar, and "was trying to get the dog off of [her]," he gave the fuey and release, or "let go," command. (Id. at 35:20-36:3, 36:15-18). Deputy Taylor estimated that Niko was "on [Ms. Hope's] arm" for "less than five seconds." (Id. at 36:5).

According to Ms. Hope's version of events, she was sitting outside with friends when she watched a large dog run across a field after some boys. (Doc. # 43-1 at 38:14-39:8). She thought the dog belonged to the boys, as she was unaware a police search was being conducted and Deputy Taylor did not warn the neighborhood he was releasing a dog in the area. (Id. at 36:21-24; 39:2-12, 47:16-17; 43-11 at 5).

Ms. Hope did not realize Niko was a police dog until it got closer, at which point she was terrified. (Doc. # 43-1 95:6-7). In her deposition, Ms. Hope explained that she tried to go inside with her companions, but "[she] was sitting [at]

the table, so [she] couldn't get up as quick as them." (Id. at 41:4-16).

Before Ms. Hope could get to safety, Niko lost sight of his target and began "looking all around." (Id. at 43:9-15). He turned and "clocked his eyes on [Ms. Hope]." (Id. at 43:9-15, 43:19-24, 95:1-3). According to Ms. Hope, Niko was "watching" her with his "ears up," which is a sign that he is "targeted . . . and will immediately pursue." (Id. at 43:19-24, 95:1-3; 43-2 at 31:24-25). Ms. Hope testified that while Niko was watching her, she did not hear Deputy Taylor attempt to recall Niko with a "here" or "fuey" command. (Doc. # 43-1 at 43:9-15, 47:11-48:11, 95:22-96:7, 98:4; Doc. # 43-11 at 5). Instead, according to Ms. Hope's sworn interrogatories, Deputy Taylor watched, without verbally intervening, as Niko came "right towards" her and jumped on her. (Doc. # 43-11 at 5; Doc. # 43-1 at 98:4-7).

At that point, Niko latched onto Ms. Hope's arm and did not let go. (Doc. # 43-1 at 99:6-17). According to Ms. Hope, Deputy Taylor still did not issue a verbal command to release. (Id. at 47:16-48:4, 96:12-22; Doc. # 43-2 at 35:20-36:3). Only when Deputy Taylor reached the fray and was "trying to get the dog off of [her]" did Ms. Hope hear Deputy Taylor say anything, although she did not understand what he was saying.

(Doc. # 43-1 at 47:16-4). Even then, Niko did not respond to Deputy Taylor's command, and was only removed when Deputy Taylor physically pulled the dog off Ms. Hope. (Doc. # 43-2 at 36:15-18).

Ms. Hope estimated during her deposition that the bite lasted anywhere from three to five minutes. (Doc. # 43-1 at 52:15-17). Her expert witness opines that the severity of the wound indicates a bite of at least two minutes, and that "Niko would not have inflicted [a wound that severe] if he bit and then quickly released." (Doc. # 49-1 at 6).

As a result of Niko's bite, Ms. Hope suffered severe injuries, including infection, to the point where she "had to have the whole thing cut out and have the whole arm restructured." (Doc. # 43-1 at 56:15-24, 58:17-24, 60:12-13).

No Manatee County Sheriff's Office policy authorizes the use of a K-9 to bite an innocent bystander, nor is there a policy that allows an officer to continue a K-9 attack on a bystander he comes to realize is innocent. (Doc. # 44-3 at ¶¶ 8-9; Doc. # 44-5 at 4-5).

In the past, Niko has bitten at least one innocent bystander. (Doc. # 43-9 at 3-4). Additionally, a list of Niko's previous deployments reflects that Niko has bitten

suspects to the bone and frequently needs to be removed from suspects by physical means. (Doc. # 50-1).

Based on the aforementioned events, Ms. Hope filed the instant action on January 24, 2020, alleging three counts: (1) unreasonable seizure in violation of the Fourth and Fourteenth Amendments against Deputy Taylor in his individual capacity, pursuant to 42 U.S.C. § 1983 (Count I), (2) deliberately indifferent policies, practices, customs, training, and supervision in violation of the Fourth and Fourteenth Amendments against Sheriff Wells in his official capacity as Sheriff of Manatee County, in violation of 42 U.S.C. § 1983 (Count II), and (3) a state negligence claim against Sheriff Wells in his official capacity as Sheriff of Manatee County pursuant to Florida Statute § 768.28 (Count III). (Doc. # 1).

Discovery is complete, and the parties have filed their respective Motions for Summary Judgment. (Doc. ## 43, 44, 46). All parties have responded (Doc. ## 47, 48, 49, 50). Only Sheriff Wells moved to file a reply, which the Court granted. (Doc. ## 53, 54, 55). The Motions are now ripe for review.

## II.  **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine

issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

## III. **Analysis**

Deputy Taylor moves for summary judgment as to Count I of the amended complaint (Doc. # 46), Sheriff Wells moves for summary judgment as to Count II (Doc. # 44), and Ms. Hope moves for summary judgment as to Count I and II. (Doc. # 43). No party seeks summary judgment on Count III. The Court will address each Motion separately.

### A. **Deputy Taylor's Motion**

Deputy Taylor moves for summary judgment on Count I of the amended complaint, which is the Section 1983 claim against him in his individual capacity. (Doc. # 46). Because there

was no clear prohibition against his actions, Deputy Taylor contends he is entitled to qualified immunity. (<u>Id.</u> at 6).

Qualified immunity offers complete protection for government officials sued in their individual capacities "as long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." <u>Sharp v. Fisher</u>, 532 F.3d 1180, 1182–83 (11th Cir. 2008) (internal quotations omitted).

"An official seeking qualified immunity must initially establish that he was acting within his discretionary authority. If the official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff." <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007); <u>see also</u> <u>O'Rourke v. Hayes</u>, 378 F.3d 1201, 1205 (11th Cir. 2004) ("To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting within the scope of his discretionary authority.").

### i. **Discretionary Authority**

"A government official proves that he acted within the purview of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" <u>Hutton v.</u>

12

Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990) (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)).

The parties do not dispute that Deputy Taylor released Niko, off lead, to pursue three young men suspected of stealing a car. (Doc. # 43-2 at 14:11-13, 15:5-11, 16:4-17:17). Under such circumstances, a police officer's decision to use a K-9 to apprehend a fleeing suspect is within the officer's discretionary authority. See Garner v. City of Ozark, No. 1:13-CV-90-WKW, 2015 WL 728680, at *7 (M.D. Ala. Feb. 19, 2015) ("There is little doubt that a police officer's decision to use a canine to apprehend a fleeing suspect is a discretionary act because there is no hard and fast rule as to the course of conduct that he must or must not take when pursuing a suspect, and the officer must use his judgment to determine what is just and proper under the circumstances." (internal quotations and alteration omitted)).

As Deputy Taylor satisfies the discretionary authority requirement, "the burden shifts to [Ms. Hope] to show that qualified immunity is not appropriate." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal citation and quotation marks omitted). This is a two-part test. First, "taken in the light most favorable to [Ms. Hope]," the alleged facts must "show that the officer's conduct violated a

constitutional right." Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003) (citation omitted). Second, "if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then consider 'whether the right was clearly established.'" Id.

Here, Ms. Hope alleges that Deputy Taylor violated her Fourth and Fourteenth Amendment rights. The Fourth Amendment guarantees that all individuals will "be secure in their person . . . against unreasonable seizures." U.S. Const. Amend. IV. This freedom encompasses the right to be free from the use of excessive force in the course of an arrest. Graham v. Connor, 490 U.S. 386 (1989).

All claims of excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Id. at 395. Accordingly, to satisfy the first prong of the test, Ms. Hope must demonstrate that: (1) a seizure occurred and (2) the force used to effect the seizure was objectively unreasonable. Troupe v. Sarasota County, 419 F.3d 1160 (11th Cir. 2005).

### ii. **Was Ms. Hope Seized?**

Deputy Taylor argues that no constitutional violation occurred because Ms. Hope was not seized. (Doc. # 46 at 7).

The Court previously found that Ms. Hope was seized within the meaning of the Fourth Amendment. (Doc. # 29).

At that time, the Court noted that "[i]n general, no seizure occurs when innocent bystanders are harmed by police actions," but "[c]ourts take a different tack in cases involving police dogs." Hope v. Taylor, No. 8:20-cv-196-VMC-AAS, 2020 WL 1677315, at *3 (M.D. Fla. Apr. 6, 2020) (internal citations omitted). This is because "[o]nce deployed, a police-dog is generally unable to discriminate between suspects and innocent parties and is generally trained to bite whomever it encounters, facts suggesting the officer's intention to seize whomever the dog ultimately does encounter." Id.

The Court comes to the same conclusion now. The Court is not persuaded by Deputy Taylor's comparison to Montanez v. City of Orlando, 678 F. App'x 905, 907 (11th Cir. 2017). In that case, the Eleventh Circuit held that a dog bite did not constitute an excessive use of force because "there [was] no evidence that [the officer] commanded or even willfully allowed [the dog] to bite [the plaintiff]." Id. at 912. The court continued, "To hold [the officer] liable, [the plaintiff] must identify an intentional action that [the

officer] took or something that he should have done but intentionally did not do to protect [the plaintiff]." Id.

Here, as the Court noted at the motion to dismiss stage, Ms. Hope establishes an intentional deployment of Niko. Hope, 2020 WL 1677315, at *4. It is undisputed that Deputy Taylor meant to release Niko from a police vehicle in order to pursue three fleeing suspects. (Doc. # 43-2 at 17:2-17). Upon release, Deputy Taylor gave Niko the "engage" command to "apprehend . . . the people that were running." (Id.). Even if Ms. Hope was not the intended target of this command, her "freedom to leave was terminated by [Deputy Taylor's] intentional release of his dog [into the neighborhood]." Hope, 2020 WL 1677315, at *4. Ms. Hope has thus established a seizure for the purposes of the Fourth Amendment.

### iii.  **Was Ms. Hope's Seizure Unreasonable?**

Under Graham, courts must determine the "objective reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "countervailing governmental interest at stake." 490 U.S. at 396. Such a test does not look to an officer's motivation or intent, but rather asks if a reasonable officer would have taken the same action under the same circumstances. Trammell v. Thomason, 559 F.

Supp. 2d 1281, 1290 (M.D. Fla. 2008), <u>aff'd in part, rev'd in part and remanded</u>, 335 F. App'x 835 (11th Cir. 2009).

The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396. Thus, in determining whether an officer's use of force was objectively reasonable, the court must consider several factors including: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and (4) whether the force was applied in good faith or maliciously or sadistically." <u>Slicker v. Jackson</u>, 215 F.3d 1225, 1232-33 (11th Cir. 2000).

A court should also consider the <u>Graham</u> factors: (1) the underlying crime's severity, (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists arrest or attempts to flee. 490 U.S. at 396.

### 1. <u>Initial Deployment</u>

Both parties agree that on the day in question, Deputy Taylor noticed a black Ford with tags matching a vehicle listed as stolen. (Doc. # 43-2 at 12:20-13:9, 14:11-13). When

Deputy Taylor circled around to report the car, the driver quickly drove off. (Id. at 14:25-15:14). Deputy Taylor followed the car until it stopped in front of a residence, at which point Deputy Taylor witnessed three suspects flee the vehicle and take off running. (Id. at 16:4-17:17).

Deputy Taylor did not have an opportunity to search the three suspects for weapons before they fled. (Id. at 16:18-17:5). Although Deputy Taylor called in the information to dispatch, other officers did not "really have a chance to get [to the scene] by the time [anything] happened." (Id. at 12:10-12). Deputy Taylor thus had to initiate pursuit quickly, without any sort of perimeter ensuring the suspects would be caught. (Id. at 12:10-12, 15:1-11). This is precisely the sort of tense, uncertain, and rapidly evolving situation the Eleventh Circuit contemplated in Graham. 490 U.S. 386, 397. The Court must make allowances for the fact that Deputy Taylor was forced to make a split-second judgment while pursuing three fleeing suspects. Id. at 396-97.

Accordingly, based on Graham and other relevant authority, the Court finds that Deputy Taylor's initial release of Niko to pursue three suspects did not constitute an excessive use of force under the circumstances. Id.; see also Crenshaw v. Lister, 556 F.3d 1283, 1292-93 (11th Cir.

18

2009) (finding it objectively reasonable for a police officer to use a canine to pursue a fleeing suspect he reasonably believed was armed); Chatman v. Navarro, No. 14-CV-62793, 2016 WL 9444164, at *6 (S.D. Fla. July 1, 2016) (finding the initial release of a police dog reasonable where suspect was fleeing, officers did not have chance to search suspect for weapon, and suspect was intentionally hiding from police).

The Court makes this finding regardless of whether Deputy Taylor provided a warning to the suspects or the neighborhood before releasing Niko. See Trammell v. Thomason, 335 F. App'x 835, 842 (11th Cir. 2009) (noting that there is Fourth Circuit case law finding a constitutional violation where a police dog was released without an adequate warning, but holding that there is no equivalent case in the Eleventh Circuit); Crenshaw, 556 F.3d at 1292 n.6 (finding that in the case of a fleeing felon who "had shown anything but an intention of surrendering," police "acted reasonably in not alerting Crenshaw that he had a canine"). Deputy Taylor is therefore entitled to qualified immunity regarding his initial decision to let Niko off his lead.

## 2. Continued Use of Niko

There remains, however, a separate question regarding the continued use of K-9 force against Ms. Hope (i.e., whether

Niko should have been called off sooner than he was). Ms. Hope claims that Deputy Taylor intentionally refrained from recalling Niko until after the dog latched onto her arm and injured her. (Doc. # 43 at 15; Doc. # 49 at 10, 12; Doc. # 43-11 at 5). According to Ms. Hope, no reasonable officer would have allowed Niko to bite her and continue to bite her for two to five minutes; therefore, Taylor violated her Fourth Amendment by failing to intervene earlier. (Doc. # 49 at 11).

The Eleventh Circuit has noted: "[Priester v. City of Riviera Beach, Fla., 208 F.3d 919 (11th Cir. 2000)] establishes that, under certain circumstances, failure to intervene in a dog attack is an obvious use of excessive force." Trammel, 335 F. App'x at 843.

The Court analyzes this issue separately from the reasonableness of Niko's initial deployment. See Chatman, 2016 WL 9444164, at *6 (finding an officer's initial employment of a police dog to be reasonable, but denying summary judgment because there was a genuine dispute over how long the officer allowed the dog to bite the plaintiff). Whether qualified immunity applies to the continued use of Niko depends on whether Officer Taylor appropriately intervened to call the dog off of Ms. Hope. See Chatman, 2016 WL 9444164, at *6 (noting that "[w]hether qualified immunity

20

applies, therefore, depends on resolving the parties' dispute over the amount of time [an officer] allegedly allowed [a dog] to bite [the plaintiff]"). The parties sharply dispute this issue and offer conflicting testimony on both sides.

Deputy Taylor testified that he issued multiple recall commands urging Niko to return, used a fuey command to tell Niko he did not want him to engage with Ms. Hope, and "took off running" towards Ms. Hope and Niko as soon as Niko bit down. (Doc. # 43-2 at 33: 1-4, 34:8-11, 35:22-24). According to Deputy Taylor, he removed Niko as quickly as possible and the bite lasted no more than five seconds. (Id. at 36:5).

Ms. Hope presents a very different version of events. According to Ms. Hope's testimony, Deputy Taylor watched in silence as Niko lost track of his intended suspect and fixated instead on Ms. Hope, a woman in her forties (Doc. # 43-1 at 8:16-19, 47:14-11) whom Deputy Taylor "should have known immediately was not the [young male suspects] for whom he was searching." Trammell, 559 F. Supp. 2d at 1294.

Despite Niko's clear focus on a bystander (evidenced by the fact that his ears were "up," indicating he was "targeted" and "[would] immediately pursue"), Ms. Hope testified that Deputy Taylor failed to call the dog off with either a recall or a fuey command. (Doc. # 43-1 at 43:12-24; 47:11-48:11;

21

94:8-9, 95:2-96:7; Doc. # 43-2 at 31:24-25; Doc. # 43-11 at 5). Absent an instruction to disengage, Niko did exactly what he was trained to do: "apprehended" Ms. Hope and refused to let go. (Doc. # 43-1 at 99:2-8).

Even upon realizing that Niko was biting and holding a bystander, rather than a suspect, Ms. Hope testified that Deputy Taylor still did not immediately command Niko to release her. (Doc. # 43-1 at 47:16-48:4, 96:12-22; Doc. # 43-2 at 35:20-36:3). Rather, taking Ms. Hope's version of events as true, Deputy Taylor waited until he physically approached and grabbed the dog to command him to release. (Doc. # 43-1 at 47:16-48:4, 96:12-22; Doc. # 43-2 at 35:20-36:3).

According to Ms. Hope, this resulted in the bite lasting two to five minutes. (Doc. # 43-1 at 52:10-17; Doc. # 49-1 at 6). To support this timing, Ms. Hope cites not only her own deposition, but expert testimony that the severity of the wound indicates a bite of at least two minutes. (Doc. # 49-1 at 6) ("Niko would not have inflicted [a wound that severe] if he bit and then quickly released.").

The Court cannot resolve these evidentiary disputes by making credibility assessments or weighing evidence. Anderson, 477 U.S. at 255; Trammell, 335 F. App'x at 844 (reversing a grant of summary judgment on qualified immunity

22

"[d]espite the fact that Trammel has been unable to put a precise time frame on the attack" because his testimony was "sufficient to raise the factual possibility that the attack continued for some significant length of time"). Were a jury to credit Ms. Hope's testimony that Deputy Taylor remained silent until after Niko engaged, indeed until after he grabbed Niko minutes later, it could conclude that Deputy Taylor acted unreasonably by failing to call off Niko sooner. Priester, 208 F.3d at 927; Trammell, 559 F. Supp. 2d at 1295.

Accordingly, there are genuine issues of material fact surrounding whether and how long Deputy Taylor allowed Niko's bite to occur before he intervened. This dispute precludes summary judgment on the issue of qualified immunity. See Chatman, 2016 WL 9444164, at *6 (denying summary judgment on qualified immunity where there was conflicting testimony on the length of the dog bite); see also Baker v. Cohen, No. 09-60103-CIV, 2010 WL 3385266, at *14 (S.D. Fla. Aug. 5, 2010), report and recommendation adopted in part, No. 09-60103-CIV, 2010 WL 3385264 (S.D. Fla. Aug. 26, 2010) (denying summary judgment on qualified immunity because "based on the record it appears there are issues of material fact, the existence of which precludes summary disposition the issue of whether the K-9 in this case should have been called off earlier than

it was, and whether plaintiff Baker sustained injuries as a result of failure to remove the dog sooner").

#### iv. **Was the Right Clearly Established?**

The Court turns to the next step in the qualified immunity analysis, which is to determine whether the right was "clearly established." Trammel, 559 F. Supp. 2d at 1294–95.

In Priester, the Eleventh Circuit denied qualified immunity to an officer who let a K-9 bite a suspect for a period of two minutes, during which it was clear that the suspect did not pose a threat of bodily injury to the officer and the suspect was not attempting to flee or resist arrest. 208 F.3d at 927. In Edwards v. Shanley, the Eleventh Circuit summarized Priester in the following way: "Quite simply, [] we held in Priester that it was unconstitutional to subject a compliant suspect to the 'eternity' of two minutes of dog attack." 666 F.3d 1289, 1298 (11th Cir. 2012). The court continued that it was similarly unconstitutional to subject a compliant suspect to a longer attack of five to seven minutes, "especially where that suspect is pleading for surrender." Id.

Therefore, at the time of Niko's bite, "clearly established federal law prohibit[ed] the police from

subjecting a compliant subject who is attempting to surrender to a lengthy dog attack." Id.

### v. Conclusion

In sum, Deputy Taylor's Motion is granted in part and denied in part. Deputy Taylor is entitled to qualified immunity for his initial decision to release Niko in pursuit of the suspects. However, a genuine dispute of material fact exists regarding whether Deputy Taylor should have intervened earlier. A reasonable jury could conclude that Deputy Taylor purposefully permitted the bite to go on longer than necessary, constituting excessive force. The existence of this dispute precludes summary judgment on the issue of whether Niko should have been called off earlier than he was, and whether Ms. Hope sustained injuries as a result of failure to remove the dog sooner.

Count I will accordingly proceed to trial, but is limited to the claim Deputy Taylor used excessive force by failing to call off Niko once he realized Ms. Hope was not a suspect.

### B.    Sheriff Wells's Motion

Sheriff Wells moves for summary judgment on Count II of the amended complaint, which is the Monell claim against him in his official capacity as Sheriff of Manatee County. (Doc. # 44). Sheriff Wells argues that the Monell claim fails

because Ms. Hope cannot demonstrate an underlying constitutional deprivation, and even if she did, Ms. Hope cannot demonstrate that the Sheriff's Office's policies were the moving force behind her injuries. (Id. at 9, 13). The Court agrees with the latter argument.

The Court has already determined that Deputy Taylor's initial deployment of Niko was not an excessive use of force under the circumstances. Therefore, Ms. Hope's Monell claim based on Niko's initial deployment must fail as a matter of law. See Knight ex rel. Kerr v. Miami-Dade Cty., 856 F.3d 795, 821 (11th Cir. 2017) (noting that "there can be no policy based liability or supervisory liability when there is no underlying constitutional violation"). Furthermore, even if a jury were to find that Deputy Taylor's continued use of Niko constituted excessive force, Ms. Hope cannot establish that an official policy or unofficial custom caused Deputy Taylor to prolong Niko's bite.

The Supreme Court has placed strict limitations on municipal liability under Section 1983. Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003). Liability may not be based on the doctrine of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Instead, liability may only attach when an official policy causes a constitutional violation. Id.

"A plaintiff, like [Ms. Hope], has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Grech, 335 F.3d at 1329 (citations omitted). "Regardless of whether the basis of the claim is an officially promulgated policy or an unofficially adopted custom, it must be the 'moving force behind the constitutional deprivation before liability may attach.'" Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (1985) (internal citation omitted).

### i.   **Officially Promulgated Policy**

No Manatee County Sheriff's Office policy authorizes the use of a K-9 to bite an innocent bystander. (Doc. # 44-3 at ¶¶ 8-9; Doc. # 44-5 at 4-5). Nor is there a policy allowing an officer to continue a K-9 attack on a bystander he comes to realize is innocent. (Doc. # 44-3 at ¶¶ 8-9; Doc. # 44-5 at 4-5). Instead, Ms. Hope argues that the Sheriff's Office's policy of using the "bite and hold" method, rather than the "find and bark" method, was the "moving force behind K9 Niko's prolonged attacks on innocent bystanders." (Doc. # 43 at 17).

The Eleventh Circuit has recognized the constitutionality of using police dogs trained in the bite and hold method. Kerr v. City of W. Palm Beach, 875 F.2d 1546, 1554 (11th Cir. 1989); see also Pace v. City of Palmetto, 489 F. Supp. 2d 1325, 1333 (M.D. Fla. 2007) ("The bite and hold training method is not unconstitutional. Nor is it objectionable [or] unreasonable." (citing Kerr, 875 F.2d at 1550)), aff'd sub nom. Pace v. Ahler, 282 F. App'x 769 (11th Cir. 2008). Other circuits have reached similar conclusions. See Jarrett v. Town of Yarmouth, 309 F.3d 54, 63 (1st Cir. 2002) (noting "there is no case that has held [bite and hold] policies to be unconstitutional"); Kuha v. City of Minnetonka, 365 F.3d 590, 600 (8th Cir. 2003) (holding that "the mere use of a police dog trained to bite and hold does not rise to the level of a constitutional violation"), abrogated on other grounds.

Nonetheless, Ms. Hope argues that the Eleventh Circuit's decision in Trammel compels a different result. (Doc. # 50 at 6). In Trammel, the Eleventh Circuit reversed summary judgment on the issue of qualified immunity because the plaintiff "raise[d] the factual possibility that [a police dog] attack continued for some significant length of time." 335 F. App'x at 844. The Eleventh Circuit held, "If a jury

[were to conclude] that [an officer] failed to stop [a dog attack] promptly after they became aware that [the victim] was not the suspect, <u>Priester</u> compels the conclusion that [the officer] engaged in an obvious violation of [the victim's] rights." <u>Id.</u>

Ms. Hope argues that it is "clear from [the <u>Trammel</u> court's] ruling that a failure to remove a police dog promptly, will result in a violation of the constitutional rights of a bite victim." (Doc. # 50 at 6). Since the bite and hold method "leads to the inability of an officer to remove the police dog promptly," Ms. Hope argues that the policy is per se unconstitutional. (<u>Id.</u>).

The Court disagrees. Because <u>Trammel</u> is an unpublished opinion, it is not binding on this Court. <u>United States v. Rodriquez-Lopez</u>, 363 F.3d 1134, 1138 n. 4 (11th Cir. 2004). Rather, <u>Kerr</u> remains the controlling precedent on the bite and hold method in the Eleventh Circuit, and under <u>Kerr</u> the mere use of the method does not establish an unconstitutional policy. 875 F.2d at 1554.

Even as a persuasive authority, <u>Trammel</u> does not suggest that the mere use of the bite and hold method is unconstitutional. In <u>Trammel</u>, the Eleventh Circuit noted that "under certain circumstances, **failure to intervene** in a dog

29

attack" constitutes excessive force. 335 F. App'x at 843 (emphasis added). But the bite and hold method does not inherently prevent an officer from intervening to stop a dog bite. Id. at 844. Nothing in Trammel indicates that an officer who promptly intervenes, but struggles to remove his dog due to the bite and hold method, has engaged in unconstitutional behavior. Id. Therefore, under both the binding authority of Kerr and the persuasive authority of Trammel, the mere use of the bite and hold method does not establish an unconstitutional policy. Id.; 875 F.2d at 1554.

Ms. Hope also makes a brief argument that the Sheriff's Office does not require its dogs to wear "e-collars" (devices worn by dogs used to discourage negative behavior), and the "lack of a mandatory e-collar on police dogs is the moving force behind constitutional violations like the one [Ms. Hope] suffered." (Doc. # 50 at 6-7). Ms. Hope does not provide any case law to support the proposition that the Fourth Amendment requires officers to utilize e-collars, or indeed any particular equipment. To the extent Ms. Hope is arguing that the lack of a mandatory e-collar policy contributes to a widespread custom of using dogs to effect unconstitutional seizures, the Court addresses that issue below.

ii.  **Unofficial Custom**

Since Ms. Hope does not establish an unconstitutional policy, to survive summary judgment she must establish a widespread custom of Manatee County Officers using their dogs in an unconstitutional way. She fails to do so.

Ms. Hope's only evidence of a widespread unconstitutional practice is (1) a list of Niko's previous deployments from the Manatee County Sherriff's Office and (2) an incident report recounting Niko's inadvertent bite of a bystander in 2018. (Doc. # 50-1; Doc. # 43-9).

Although these records reveal that some of Niko's bites were severe, and that Niko had to be removed from most suspects by physical force, Ms. Hope fails to show how these incidents involved constitutionally excessive force. She does not provide any evidence indicating the handlers in these cases intentionally prolonged Niko's bite or failed to promptly call Niko off, as she accuses Deputy Taylor of doing. See Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998) (holding that a plaintiff could not establish a Monell claim when he could not point to any other incidents involving similar facts). Even when Niko bit a bystander in 2018, the evidence indicates his handler quickly intervened to remove him. (Doc. # 43-3 at 3-4).

Ms. Hope must point to factually similar scenarios in order to establish a widespread custom. See Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005) (upholding dismissal of a Monell claim where plaintiff "was given a list of all cases involving excessive force, but [could not] show that any of them involved factual situations that [were] substantially similar to the case at hand"). A list of Niko's previous bites, without more, does not show that any of these bites involved excessive force. See Adams v. Custer, No. 14-CV-80403-CIV, 2016 WL 155081, at *19 (S.D. Fla. Jan. 12, 2016) (holding that without any sort of "statistical context or expert explanation, the plaintiff's statistical evidence of prior police-involved shootings and complaints of excessive force is insufficient as a matter of law to sustain a custom and practice claim under Monell against the Sheriff"), aff'd sub nom. Adams v. Sheriff of Palm Beach Cnty., 658 F. App'x 557 (11th Cir. 2016).

Absent any context, testimony, or evidence indicting these situations were factually similar to Ms. Hope's bite, a jury could not reasonably find that the Sheriff's Office had a widespread custom of either allowing dogs to bite bystanders or prolonging dog bites in violation of the Fourth Amendment. See Samarco v. Neumann, 44 F. Supp. 2d 1276, 1290

32

(S.D. Fla. 1999) (finding that a list of incidents where other suspects were seriously injured by police dogs was not enough "to convince a reasonable jury that the Sheriff's Office had a custom of depriving persons of their Fourth Amendment rights"); cf. Shehada v. Tavss, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) (finding that a list of complaints against officers did not establish a practice of deliberate indifference "the Plaintiff must present at least some evidence from which a reasonable jury could infer that the complaints were meritorious"). Sheriff Wells's Motion is accordingly granted.

### C.   **Ms. Hope's Motion**

In Ms. Hope's Motion, she seeks summary judgment on Counts I and II of the amended complaint. (Doc. # 43).

Regarding Count I, the Court has already held that Deputy Taylor is entitled to qualified immunity regarding his initial decision to let Niko off his lead. Therefore, this portion of Ms. Hope's Motion is denied.

Furthermore, the Court has also held that there is a genuine dispute of material fact surrounding the circumstances of Niko's bite. If a jury were to credit Deputy Taylor's testimony that he recalled Niko and pulled him off within five seconds, it could reasonably conclude that no

excessive use of force occurred. Ms. Hope's Motion is accordingly denied as to the remainder of Count I, as there are genuine factual disputes that require resolution by a jury. See Anderson, 477 U.S. at 255 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Regarding Count II, the Court has already found it proper to grant summary judgment in favor of Sheriff Wells. Therefore, this portion of Ms. Hope's Motion is also denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Austin Taylor's Motion for Summary Judgment (Doc. # 46) is **GRANTED IN PART AND DENIED** in part. Deputy Taylor is entitled to qualified immunity for his initial decision to release Niko. The Motion is denied to the extent Ms. Hope alleges Deputy Taylor used excessive force by failing to call off Niko once he realized Ms. Hope was not a suspect.

(2) Defendant Charles Richard Wells's Motion for Partial Summary Judgment (Doc. # 44) is **GRANTED.** Summary judgment is granted in favor of Sheriff Wells as to Count II.

(3)   Plaintiff Elizabeth Diane Hope's Motion for Summary

       Judgment (Doc. # 43) is **DENIED**.

       **DONE** and **ORDERED** in Chambers, in Tampa, Florida, this

23rd day of February, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE